UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

GERALD SCARDAVILLE, HELEN
SCARDAVILLE,

               Plaintiffs,

-vs-                               Case No.  5:04-cv-389-Oc-10GRJ

ILLINOIS UNION INSURANCE COMPANY,

               Defendant.
_____

## O R D E R

This insurance contract dispute is before the Court for consideration of Defendant's

Motion for Summary Judgment (Doc. 20), to which the Plaintiffs have responded (Doc. 29).

This motion is ripe for review and the Court concludes that it is due to be granted.

## PROCEDURAL BACKGROUND

This action was removed from state court on August 25, 2004 (Docs. 1,2).  The

Plaintiffs allege that they had a contractual relationship with Charon M. Bogner, a

registered investment advisor and agent; that Ms. Bogner was employed by A & F

Financial Securities, Inc. (A & F Financial); that the Defendant, Illinois Union Insurance

Company, insured A & F Financial and Ms. Bogner; and that the Plaintiffs were entitled to

bring this action as third party beneficiaries of the Illinois Union insurance policy.

Specifically, having recovered a judgment against Ms. Bogner for $174,000, the Plaintiffs

brought this suit to recover that amount from Illinois Union.

The Defendant filed an Answer to the Plaintiffs' Complaint and a Counterclaim for declaratory relief (Doc. 7).  The Defendant claims that the insurance policy does not provide coverage for the losses suffered by the Plaintiffs because the cause of the damage occurred in November of 1999, prior to Ms. Bogner's affiliation with A & F Financial, and all subsequent wrongful acts of Ms. Bogner were related to the initial securities transaction in dispute.  The Defendant also asserts that timely notice of the claim was not provided as required by the policy.

## STATEMENT OF THE FACTS

*A.  The Plaintiffs' Claim Against Charon M. Bogner*

In 1998, after Plaintiff Gerald Scardaville had been employed with Anheuser-Busch for 39 years and had accumulated 5,066 shares of Anheuser-Busch stock in his 401K plan, the Plaintiffs moved to "The Villages" in Lady Lake, Florida.[1]  In March of 1999, the Plaintiffs met Ms. Bogner while she was delivering an educational seminar at a social club in "The Villages."[2]  When the Plaintiffs first met Ms. Bogner, she was employed by Life USA Securities, Inc.[3]  The Plaintiffs claim that Ms. Bogner held herself out as an "accredited

---

[1]     Doc. 24, Deposition of Gerald Scardaville, pg. 1, 5, 15.

[2]     Id. at 15-16; Doc. 23, Deposition of Charon M. Bogner, pg. 23-24.

[3]     Doc. 34, Joint Pretrial Stipulation, Statement of Facts Admitted by the Parties, pg. 6.

estate planner" and "financial advisor" who offered clients investment advice and the ability to purchase securities through Life USA Securities, Inc.[4]

The Plaintiffs first met with Ms. Bogner at her office to establish a retirement plan for them on March 22, 1999.[5]   The Plaintiffs claim that they told Ms. Bogner that their investment objective was to preserve their life savings and invest it conservatively to supplement their retirement income.[6]   In addition, the Plaintiffs claim that they revealed their serious health conditions to Ms. Bogner, suggesting that their investments must be liquid in case of an emergency, and that they were extremely conservative and had no prior investment experience.[7]

In November of 1999, Ms. Bogner sold all of the Plaintiffs' shares of Busch stock and invested $345,922.10 of the proceeds of that sale into various mutual funds contained within a variable annuity contract with Nationwide Life Insurance Company.[8]   The Plaintiffs' funds were allocated within the annuity as follows: 46% to the Dreyfus Capital Appreciation portfolio, 30% to the FID Equity Income portfolio, and 24% to the FID High Income

---

[4]      Doc. 2, Complaint, Exh. 1, Statement of Claim, pg. 1.

[5]      Doc. 23, Deposition of Charon M. Bogner, pg. 25-26; Doc. 24, Deposition of Gerald Scardaville, pg. 17-18.

[6]      Doc. 2, Complaint, Exh. 1, Statement of Claim, pg. 1-2.

[7]      Id. at 3; Doc. 24, Deposition of Gerald Scardaville, pg. 11.

[8]      Doc. 23, Deposition of Charon M. Bogner, pg. 28-29, 50;  Doc. 24, Deposition of Gerald Scardaville, pg. 57-58.

portfolio.[9]   The Plaintiffs' account representative for their annuity with Nationwide was Angelo Rossello, and Ms. Bogner worked with Mr. Rossello to purchase the annuity and allocate the funds.[10]  Plaintiff Gerald Scardaville testified that Ms. Bogner promised that the annuity would allow the Plaintiffs to make no less than 14% annually and that they would be able to draw $2000.00 per month and never touch the principal.[11]

By February of 2000, the Plaintiffs lost approximately $28,000.00.[12]   As a result of these losses, Plaintiff Gerald Scardaville met with Ms. Bogner and asked her to remove the funds from the Nationwide annuity.[13]  At this meeting, the Plaintiffs claim that they learned for the first time that their money could not be withdrawn from their annuity for seven years without a substantial early withdrawal penalty.[14]  Although the Plaintiffs could not withdraw their funds from the annuity without penalty, they had the option of reallocating their funds to different portfolios within the annuity.  Accordingly, in March of 2000, Ms. Bogner reallocated the funds within the Plaintiffs' Nationwide annuity to the Janis Aspen Capital

---

[9]      Doc. 34, Joint Pretrial Stipulation, Statement of Facts Admitted by the Parties, pg. 6-7.

[10]      Id. at 7; Doc. 24, Deposition of Gerald Scardaville, pg. 46.

[11]      Doc. 24, Deposition of Gerald Scardaville, pg. 11.

[12]      Doc. 34, Joint Pretrial Stipulation, Statement of Facts Admitted by the Parties, pg. 7.

[13]      Doc. 24, Deposition of Gerald Scardaville, pg. 64.

[14]      Doc. 2, Complaint, Exh. 1, Statement of Claim, pg. 5; Doc. 24, Deposition of Gerald Scardaville, pg. 12, 65-66.  Ms. Bogner admits that the annuity had an early withdraw penalty, but she claims she explained this fact to the Plaintiffs prior to purchasing the annuity.  Doc. 23, Deposition of Charon M. Bogner, pg. 36-37.

Appreciation portfolio, the Strong Midcap Growth Fund, and the Oppenheimer Aggressive Growth Fund.[15]  By the end of May 2000, the Plaintiffs had suffered a $100,925.00 loss in their investments.[16]  The Plaintiffs claim that Ms. Bogner advised them to "stick it out" with their current investments.[17]

On January 23, 2001, before Ms. Bogner became a registered representative with A & F Financial in February of 2001,[18] and became an insured under the Illinois Union policy issued to A & F Financial, Ms. Bogner met with the Plaintiffs again regarding the performance of their annuity.[19]  And that time, the Plaintiffs had experienced approximately $100,000.00 in losses.[20]  Ms. Bogner testified that at that meeting she would have recommended for the Plaintiffs to leave their funds in their current investments because it was not prudent to reallocate the funds after they were just recently reallocated.[21]  Ms. Bogner testified that after her meeting with the Plaintiffs on January 23, 2001, the Plaintiffs

---

[15]     Doc. 2, Complaint, Exh. 1, Statement of Claim, pg. 6; Doc. 23, Deposition of Charon M. Bogner, pg. 39-41, 56;  Doc. 24, Deposition of Gerald Scardaville, pg. 68-69.

[16]     Doc. 2, Complaint, Exh. 1, Statement of Claim, pg. 6.

[17]     Doc. 2, Complaint, Exh. 1, Statement of Claim, pg. 6.

[18]     Doc. 25, Deposition of Lester Ariail, pg. 7-8, 47; Doc. 23, Deposition of Charon M. Bogner, pg. 15.

[19]     Doc. 23, Deposition of Charon M. Bogner, pg. 47; Doc. 34, Joint Pretrial Stipulation, Statement of Facts Admitted by the Parties, pg. 7.

[20]     Doc. 23, Deposition of Charon M. Bogner, pg. 46; Doc. 24, Deposition of Gerald Scardaville, pg. 74.

[21]     Doc. 23, Deposition of Charon M. Bogner, pg. 46-47.

were in communication with Mr. Rossello at Nationwide, and she does not remember making any changes after that date to the Plaintiffs' investment portfolio.[22]  Ms. Bogner further testified that when the Plaintiffs' investment portfolio was changed again on March 19, 2001, and the Plaintiffs' funds were reallocated in part to the NSAT Government Bond Fund and NSAT High Income Bond Fund, Mr. Rossello must have made those changes.[23] Mr. Scardaville does not remember making any changes to the annuity during the first quarter of 2001 and does not know whether Mr. Rossello or Ms. Bogner made the changes to the annuity during that time period.[24]

Between January 1, 2001 and March 31, 2001, the Plaintiffs' annuity decreased in value by another $47,901.19.[25]  And by June 30, 2001, the Plaintiffs no longer used the services of Ms. Bogner and Mr. Rossello and switched to a completely different broker.[26]

On November 19, 2001, the Plaintiffs filed a claim with the National Association of Securities Dealers, Inc. (NASD) against Ms. Bogner.[27]  The Plaintiffs claimed that due Ms. Bogner's misrepresentations, her failure to adequately disclose risks and material facts so

---

[22]     Id. at 47-48.

[23]     Id. at 57-58; Doc. 34, Joint Pretrial Stipulation, Statement of Facts Admitted by the Parties, pg. 7.

[24]     Doc. 24, Deposition of Gerald Scardaville, pg. 77-78.

[25]     Id. at 74-75.

[26]     Id. at pg. 80.

[27]     Doc. 2, Complaint, Exh. 1, Statement of Claim; Doc. 24, Deposition of Gerald Scardaville, pg. 11.

that the Plaintiffs could make informed decisions, and her selection of an unsuitable investment vehicle for the Plaintiffs, they suffered a loss of $198,606.00 in their life savings.[28]

The Plaintiffs and Ms. Bogner entered into a settlement agreement to resolve their NASD dispute.[29]   In the settlement agreement, Ms. Bogner agreed to the entry of a judgment in a civil action in the amount of $174,000.00.[30]   The Plaintiffs agreed not to record the judgment in any official records of any county or of the State of Florida.[31]   The Plaintiffs further agreed to take no action against Ms. Bogner to enforce, collect, or satisfy the judgment against her.[32]   Ms. Bogner also agreed to cooperate with the Plaintiffs and their attorney in any action brought by them against A & F Financial or A & F Financial's insurer.[33]

On October 3, 2003, the Circuit Court in Marion County, Florida entered final judgment in favor of the Plaintiffs against Ms. Bogner in the amount of $174,000 pursuant to their settlement agreement.[34]

---

[28]     Doc. 2, Complaint, Exh. 1, Statement of Claim, pg. 6-7.

[29]     Doc. 2, Complaint, Exh. 2; Doc. 23, Deposition of Charon M. Bogner, pg. 85.

[30]     Doc. 2, Complaint, Exh. 2, pg. 1.

[31]     Id.

[32]     Id.

[33]     Id.

[34]     Doc. 2, Complaint, Exh. 3.

*B. The Insurance Policy*

The Defendant issued a "Financial Services Professional Liability Insurance Policy" to A & F Financial, policy number CRL G2 1071705, for the policy period beginning on July 11, 2001 and ending on July 11, 2002.[35] Charon M. Bogner is listed as a named insured in the policy.[36] The policy "is a 'claims-made and reported' policy" and it "covers only 'written claims' first presented to [the Defendant] during the 'policy period' for the insured arising from 'wrongful acts' occurring subsequent to the applicable 'retroactive date.'"[37] The "Representatives Endorsement" portion of the policy provides that an "insured representative's 'retroactive date' shall be the later of May 26, 1998, or his/her first date of continuous contract or employment with the First Named Insured . . ."[38] Therefore, Ms. Bogner became covered by the policy when her employment began with A & F Financial in February of 2001.

In relevant part, the coverage section of the policy provides:

> [The Defendant] will pay on behalf of the insured all sums in excess of the "retention" which do not exceed the applicable Limit of Liability and which the insured shall become legally obligated to pay as money "damages" because of a "wrongful act" to which this policy applies committed by the insured . . .

---

35 Doc. 20, Defendant's Motion for Summary Judgment, Exhibit 1, Insurance Policy, pg. 2.

36 Id. at 15.

37 Id. at 3.

38 Id. at 15.

but only if the "wrongful act", or the first in the series of continuous, repeated or "interrelated wrongful acts":

1. arises solely out of or in connection with the provision of "financial services" for the "client" of a named insured by an insured "financial services professional";
2. occurs during the "coverage period". . .; and
3. results in a "written claim" which is first presented to us during the insured's "policy period". . .[39]

The policy defines "wrongful act" as "any negligent breach of duty, error, misstatement, misrepresentation, omission, 'publication injury', or other negligent act done or attempted by an insured . . . in conjunction with the provision of 'financial services' for the 'client' of a named insured by a named insured 'financial services professional.'"[40]

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In Celotex Corp. v. Catrett, the Supreme Court recognized that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

---

[39]     Id. at 6.

[40]     Id.

9

burden of proof at trial."[41]   The moving party bears the initial burden of establishing the nonexistence of a triable fact issue.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."[42]   The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.[43]

## DISCUSSION

Under Florida law, to enforce a consent judgment against an insurer, the injured party must bring an action against the insurer and prove: (1) coverage; (2) wrongful refusal to defend; and (3) that the settlement was reasonable and made in good faith.[44]   The Court concludes that the Defendant's Motion for Summary Judgment is due to be granted because the Plaintiffs have not come forward with sufficient evidence to create a genuine issue of fact that the Plaintiffs' claims are covered by the policy at issue in this case.

Ms. Bogner became covered under the policy when she became a registered representative for A & F in February of 2001.  The record shows that the only wrongful act that could possibly have occurred after February of 2001, or within the coverage period,

---

[41]     477 U.S. 317, 322 (1986).

[42]     Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).

[43]     Celotex, 477 U.S. at 324.

[44]     Ahern v. Odyssey Re (London) Ltd., 788 So.2d 369, 372 (Fla. 4th DCA 2001).

occurred when funds within the Plaintiffs' annuity were reallocated for a second time on March 19, 2001. Ms. Bogner testified that her last meeting with the Plaintiffs occurred on January 23, 2001, and Mr. Rossello at Nationwide must have made any changes to the Plaintiffs' accounts after that time. And Plaintiff Gerald Scardaville testified that he was not sure who made the change to his account on March 19, 2001. Furthermore, there is insufficient evidence to prove that the Plaintiffs suffered any damages because of the alleged wrongful act occurring on March 19, 2001. The evidence shows only that the Plaintiffs' entire annuity decreased in value by about $48,000 during the first quarter of 2001, and does not show what part, if any, of the loss was attributable to the March 19, 2001 reallocation. Accordingly, the Court concludes that since the Plaintiffs have not come forward with sufficient evidence to demonstrate a material issue of fact that any wrongful acts were committed by Ms. Bogner within the policy period, or that they suffered any damages as a result of the only possible wrongful act which could have occurred within the policy period, the Plaintiffs have failed to establish coverage under the policy and summary judgment is due be granted.

## CONCLUSION

Upon due consideration, and for the foregoing reasons, it is ordered that:

(1) the Defendant's Motion for Summary Judgment (Doc. 20) is GRANTED; and

(2) the Clerk is directed to enter judgment according, terminate any pending motions, and close the file in this matter.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 4th day of May, 2006.

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record